IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOEL ANTHONY HOLLEY,

        Plaintiff,                          No. CIV S-04-2708 LKK EFB P

    vs.

TOM L. CAREY, et al.,

        Defendants.                 FINDINGS AND RECOMMENDATIONS

_____/

       Plaintiff is a prisoner without counsel seeking relief for alleged civil rights violations. *See* 42 U.S.C. § 1983; 42 U.S.C. §§ 12131 - 12164. This action proceeds on the December 10, 2004, complaint in which plaintiff claims: (1) defendants Huff, Lane and Korte caused plaintiff to be demoted from his prison job in violation of Title II of the Americans with Disabilities Act (ADA); and (2) Huff, Lane and Korte caused plaintiff to suffer a pay decrease and the loss of his prison job because plaintiff receives mental health services, in violation of the Equal Protection Clause of the Fourteenth Amendment; (3) Defendants Huff, Lane and Korte caused plaintiff's pay to be decreased in retaliation for plaintiff having filed grievances; and (4) defendant Carey is subject to liability for each claim because plaintiff informed him of the other defendants' actions but Carey failed to intervene on plaintiff's behalf. The matter is currently before the court on defendants' motion for summary judgment.

## I. Facts

At all times relevant to this action, plaintiff was a prisoner at California State Prison, Solano (CSP-Solano) and worked for the Prison Industry Authority (PIA). Defendant Carey was the warden at CSP Solano. Defendant Huff was plaintiff's immediate supervisor at the PIA. Defs.' Mot. for Summ. J., Ex. E, Huff Decl., ¶ 2-3; Ex. A, Pl.'s Dep., at 58:2-24. Defendant Korte had been Holley's immediate supervisor in the past. Defs.' Mot. for Summ. J., Ex. D, Korte Decl., ¶¶ 2-3, 13. Defendant Lane was the PIA Superintendent at CSP-Solano. *Id*., Ex. C, Lane Decl., ¶¶ 2-3.

A brief overview of the PIA and the obligations of supervisors is necessary in order to understand the court's findings and recommendations. The PIA is an entity within the Department of Corrections and Rehabilitation which employs prisoners in agricultural and industrial positions. Cal. Gov't Code §§ 12838(a), 12838.6 (West 2007); Cal. Penal Code §§ 2701, 2805 (West 2007). A PIA superintendent is responsible for ensuring safe and secure PIA operations, i.e., maintaining order, preventing escape or injury and overseeing the supervisors within the superintendent's department. Lane Decl., ¶ 3. Supervisors in the PIA are responsible for quality control, production control and inventory control, maintaining discipline, reporting worker performance and recommending pay increases and decreases. Huff Decl., ¶ 3; Korte Decl., ¶ 3 . Supervisors regularly evaluate prisoner workers on forms labeled, "Work Supervisor's Report." The possible ratings were "exceptional," above average," "satisfactory," "below average," or "unsatisfactory." Pl.'s Dep., Ex. G. Skills and performance were evaluated by ranking workers in ten separate categories, such as skill and knowledge, attitude towards supervisors, attitude towards fellow workers and quality of work. *Id.*

The PIA has a pay scale for prisoners, awarding pay and positions commensurate with demonstrated skills and performance. Korte Decl., ¶ 4, 11-12; Huff Decl., ¶ 4, 11-12; Lane Decl., ¶ 4, 11-12. The position of the "leadman," who assists a supervisor, is designated the highest pay level, at $.75 and $.95 per hour. Korte Decl., ¶ 5; Huff Decl., ¶ 5, Lane Decl., ¶ 5.

1  The next highest pay level is designated, "A," which pays between $.65 and $75 per hour. Korte
2  Decl., ¶ 6; Huff Decl., ¶ 6; Lane Decl., ¶ 6. Prisoners employed in this pay grade must have
3  special skills. *Id.* At this level, a prisoner works on production lines or complex machines, or as
4  mechanics and craftsmen responsible for difficult and technical work, or clerical positions. *Id.*
5  Workers at this level must be able to function with limited supervision. *Id.* The next pay grade
6  is "B," which pays between $.55 and $.65 per hour. Korte Decl., ¶ 7; Huff Decl., ¶ 7; Lane
7  Decl., ¶ 7. Workers at this pay grade are journeymen, mechanics, craftsmen, heavy equipment
8  operators and clerks who work for civil service employees, and must be able to work with
9  intermittent supervision. *Id.* The next pay grade is designated "C," and pays between $.45 and
10 $.55 per hour. Korte Decl., ¶ 8; Huff Decl., ¶ 8; Lane Decl., ¶ 8. Those hired at this pay grade
11 are semi-skilled workers, including apprentice mechanics, medium machine and equipment
12 operators, floor men who assist in training laborers and clerks with less responsibility than
13 "technician classifications." *Id.* The lowest pay grade is "D," which pays between $.30 and $.40
14 per hour. Korte Decl., ¶ 9; Huff Decl., ¶ 9; Lane Decl., ¶ 9. Prisoners hired at this pay grade
15 perform entry level work and require direct supervision. *Id.* At any given pay grade, supervisors
16 can either decrease a prisoner's pay or demote him if his skills or work performance deteriorates.
17 Korte Decl., ¶ 4, 11-12; Huff Decl., ¶ 4, 11-12; Lane Decl., ¶ 4, 11-12. With this overview, the
18 court now turns to the facts of this case.

19     On March 10, 2000, plaintiff was assigned to work in Metal Fabrication in the Saws and
20 Shears department. Pl.'s Dep., Ex. C. The machinery in this department is large and if not
21 operated properly can cause death or serious injury. Huff. Decl., ¶ 18; Lane Decl., ¶ 21.
22 Plaintiff worked as a "shear operator" until February 2003, when he was reassigned to the Paint
23 Department because there was not enough work to be done in Metal Fabrication. *Id.* It is not
24 clear from the record when, but plaintiff returned to his job in Metal Fabrication.

25     Over the years, Korte and Huff evaluated plaintiff's job performance, for the most part
26 finding it to be mostly satisfactory or below average. On occasion, plaintiff's performance was

3

considered to be above average. On December 1, 2000, defendant Korte found that plaintiff's performance as a metal fabricator was satisfactory in every category. Pl.'s Dep., Ex. G. On January 1, 2002, he found plaintiff's performance in that position satisfactory in every category except interest in work and attitude to supervisors and staff. *Id.* In these categories, he found plaintiff's performance to be above average. *Id.* On March 1, June 1, and July 1, 2002, Korte found plaintiff's performance as a machine operator to be satisfactory in all categories except attitude to supervisors and interest in work. *Id.* In these categories, he found plaintiff's performance to be above average. *Id.* On October 1, 2003, however, defendant Huff determined that plaintiff's performance as a machine operator was satisfactory in every category. *Id.* On January 27, 2004, Lane warned plaintiff that his job performance was so poor that plaintiff's skill rating could be reduced. Lane Decl., ¶ 17. Lane told plaintiff that supervisors would be monitoring his performance and plaintiff would have an opportunity to improve his work before any pay reduction occurred. *Id.* Defendant Huff's February 1, 2004, evaluation of plaintiff was that his performance was below average in all categories, except attitude towards other workers and supervisors. Pl.'s Dep., Ex. I. In these categories, plaintiff's performance was satisfactory. *Id.* Huff noted that plaintiff's skills had deteriorated, he was unable to "retain proper operational procedures for equipment," and he was not functioning at the skill level he previously exhibited. *Id.* Huff recommended that plaintiff be retained in his position, but that his pay be decreased. *Id.* Lane discussed with plaintiff Huff's February 1, 2004, quarterly work report and the recommendation that plaintiff's pay be decreased. Lane Decl., ¶ 18; Pl.'s Dep. at 104:14 - 105:14. On February 24, 2004, plaintiff filed a grievance complaining that his pay grade should not be decreased. Pl.'s Dep., Ex. D. Defendant Lane denied the grievance because no adverse action, i.e., the threatened demotion, had yet been taken. *Id.*

    On February 26, 2004, defendant Korte, wrote a chronological history note for plaintiff's central file documenting his opinion of plaintiff's work performance and ability. Pl.'s Dep., Ex. C. In it, he states that when plaintiff returned to the Saws and Shears Department, Korte

observed that Holley had forgotten skills essential to his job, including how to set up and operate equipment. *Id.* Korte's notation also states that he discussed plaintiff's deteriorating work performance with him and attempted to retrain him, but plaintiff's performance never returned to its former level. *Id.* Korte believed that at this point plaintiff was not qualified to work at the "A" pay grade. *Id.* Plaintiff was informed of this notation, including the recommendation of a pay decrease. *Id.* At deposition, plaintiff testified that his skills had not deteriorated and that Korte did not attempt to retrain plaintiff. Pl.'s Dep., at 52.

On February 26, 2004, defendant Huff made a notation about plaintiff's job skills and performance to be placed in plaintiff's central file. Pl.'s Dep., Exh. F. He noted that plaintiff did not have the skills required to work in an "A" grade position and that as a Saws and Shears Operator plaintiff posed a "high possibility of causing himself and others, as well as equipment, grave physical harm constituting a safety hazard." *Id.* Huff believed that Holley's skill rating should be decreased. *Id*. Plaintiff was made aware of this assessment before the document was issued. *Id.* Based on this notice, plaintiff filed a grievance challenging Lane's and Huff's assessment of plaintiff's work skills and performance. Pl.'s Dep., at 59. The appeals coordinator rejected the appeal because no decrease in pay or demotion had yet occurred. *Id.* at 60. At deposition, plaintiff testified that defendant Huff gave plaintiff poor evaluations simply to follow Korte's lead. Pl.'s Dep., at 59. He testified that he was doing well in his job with saws and shears and told Huff this was the case, but Huff ignored him and continued to draft unfavorable evaluations. *Id.*

On March 24, 2004, defendant Lane drafted a notation for plaintiff's central file stating that supervisors closely monitored plaintiff's work performance and skills in February, March and April 2004. Pl.'s Dep., Ex. E. Lane stated that plaintiff was unable to perform the technical work under limited supervision as required at pay grade "A." *Id.* He also stated that Holley "also demonstrated possible safety concerns when operating complex machines." *Id.* Lane identified no specific incidents to explaining his evaluation, but nevertheless found that

1   plaintiff's "skill level is more appropriately at a "C" level," and stated that this demotion would
2   become effective on May 1, 2004. *Id.* Holley was given a copy of this document and informed
3   that his pay grade would be decreased "A" to "C," effective May 1, 2004. Lane Decl., ¶ 22. At
4   deposition, plaintiff admitted he knew that his pay would be reduced in May. Pl.'s Dep., 9.
5   Lane and Huff believed that Holley's improper use of machinery and tools, including those in
6   Saws and Shears, presented safety concerns. Lane Decl., ¶¶ 14-16, 25; Huff Decl., ¶ 19.

7   Plaintiff participates in the Correctional Clinical Case Management System (CCCMS)
8   because he takes certain medications. Pl.'s Dep., at 55. He has not been diagnosed with a
9   mental illness. *Id.* at 56-57. While plaintiff worked in the PIA, he took an unspecified
10  medication to help him sleep, but he had to stop taking it because it interfered with his work. *Id.*,
11  at 26-27. He also took Trazadone[1]. Pl.'s Dep., at 27. At some unspecified time in 2004, while
12  under the stress of poor evaluations and threatened decrease in pay, plaintiff's psychiatrist
13  increased his dosage from 100 to 200 milligrams. *Id.*, at 26. On April 29, 2004, plaintiff told
14  Lane that he was taking prescription sleeping medication. Lane Decl., ¶ 23-24. Lane called a
15  medical technical assistant ("MTA") and advised him that plaintiff's job involved operating
16  machinery. *Id.* Lane requested that someone check plaintiff's medication to determine whether
17  there were any warnings against operating machinery. *Id.* The MTA drafted an "outpatient
18  interdisciplinary progress note," stating that defendant Lane called from Metal Fabrication
19  reporting that plaintiff was "having problems with driving heavy equipment," and that plaintiff's
20  "mental status" was "going in and out." Pl.'s Dep., Ex. B. Lane expressed a concern about
21  plaintiff's ability safely to use the equipment, and requested that a doctor re-evaluate plaintiff for
22  job placement specifically stated that he did not want detailed information about plaintiff. Lane
23  Decl., ¶ 23-24.
24  ////

---

[1] Neither party explains the purpose or side effects, if any, of this medication.

On May 4, 2004, plaintiff wrote a letter to defendant Warden Carey complaining that Lane repeatedly placed plaintiff on the weekly "layoff" list and that Lane attempted to manipulate plaintiff's physician into directing that plaintiff be unassigned from Metal Fabrication for medical reasons. Pl.'s Dep., Ex. K. On May 7, 2004, defendant Carey responded. *Id.* Carey directed plaintiff to "address [the] issue through the chain of command within your facility for response and/or action," and encouraged plaintiff to use the Inmate Appeals system to resolve the his problems. *Id.* Carey briefly explained the mechanics of the appeals process. *Id.* Finally, he informed plaintiff that he should contact the Appeals Office or his assigned Correctional Counselor I if he had any questions. *Id.*

On July 7, 2004, plaintiff submitted a grievance complaining that Lane retaliated against him by contacting the Mental Health Department about plaintiff's medications. Pl.'s Dep., Ex. J. He received no response because of a lockdown, and on July 26, 2004, plaintiff re-submitted the grievance. Pl.'s Dep., Ex. J. Defendant Huff's September 30, 2004, evaluation of plaintiff's work performance was "below average" in every possible category, noting that plaintiff's work ethic had deteriorated over time, especially in that plaintiff "wanders away from his assignment and does not pay attention to his job." *Id.* On December 1, 2004, plaintiff filed a grievance complaining that defendant Huff made notations on the back of a November evaluation "Work Supervisor Report" that were not favorable to plaintiff, and specifically asserting that he never walked away from a job assignment. Pl.'s Dep., Ex. G. On December 7, 2004, plaintiff was removed from his job in PIA. Pl.'s Dep., at 73.

At deposition, plaintiff testified that a prisoner employee who drove a forklift ran over the leg of another prisoner while working. Pl.'s Dep., at 83. Plaintiff testified that this prisoner is known to use drugs, but prison officials did not test him for drugs. *Id.* Instead, the prisoner was not allowed to drive forklifts for two weeks while prison officials inspected the forklifts. *Id.* He also testified that a different prisoner working in the Saws and Shears department cut himself twice on a machine. Pl.'s Dep., at 87. Plaintiff testified that prison officials did not consider

reducing this prisoner's pay and did not "write him up." *Id.*

Defendant Cary did not demote Holley or terminate his PIA employment. Pl.'s Dep., at 43:10-12, 43:16-19.

## II. Summary Judgment Standards

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[2] The utility of Rule 56 to determine whether there is a "genuine issue of material fact," such that the case must be resolved through presentation of testimony and evidence at trial is well established:

> [T]he Supreme Court, by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment. First, the Court has made clear that if the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Second, to withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis added). Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). No longer can it be argued that *any disagreement* about a material issue of fact precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added). In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to

---

[2] On October 5, 2004, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

8

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322). There can be no genuine issue as to any material fact where there is a complete failure of proof as to an essential element of the nonmoving party's case because all other facts are thereby rendered immaterial. *Celotex,* 477 U.S. at 323.

With these standards in mind, it is important to note that plaintiff bears the burden of proof at trial over the issues raised on this motion, i.e., whether the defendants retaliated against plaintiff for his exercise of a First Amendment right and whether they discriminated against him in violation of the Equal Protection Clause of the Fourteenth Amendment. With respect to retaliation, plaintiff must produce evidence sufficient to meet his burden of proof that his exercise of a protected right resulted in defendants taking adverse action against him. *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir.1995). With respect to his claim of discrimination, plaintiff must prove that defendants discriminated against him impermissibly based on his membership in a protected class. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (per curiam). Therefore, to withstand defendant's motion, plaintiff may not rest on the mere allegations or denials of his pleadings. He must demonstrate a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). He must rely on evidence based upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

**III. Analysis**

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Here, most of plaintiff's claims arise under 42 U.S.C. Section 1983 and the First and Fourteenth Amendments. To prevail at trial, he must prove that the defendant deprived him of these rights while acting under color of

state law. To prove retaliation, plaintiff must show by a preponderance of competent evidence that the defendants took adverse action against plaintiff because of plaintiff's exercise of a First Amendment right, and that the adverse action does not further any legitimate penological goal. *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir.1994) (per curiam). To prove discrimination that violates the Equal Protection Clause of the Fourteenth Amendment, plaintiff must prove by a preponderance of the evidence that defendants discriminated against him based on his membership in a protected class. *See City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). As discussed below, plaintiff has failed to establish a genuine dispute for trial over any material issue.

**A.  ADA**

As an initial matter, the court dispenses with plaintiff's ADA claim. He claims that defendants violated Title II of the ADA by discharging him from his prison job based on their perception that he had a mental illness. While Title II of the ADA applies to prisons, *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998), it does not apply to employment. *Zimmerman v. Oregon Department of Justice*, 170 F.3d 1169, 1173-74 (9th Cir. 1999). Plaintiff's claim relates to defendants' alleged actions taken in connection with plaintiff's employment in the Prison Industry Authority while a prisoner. Plaintiff simply cannot obtain any relief on his allegations under the ADA. Therefore, this claim must be dismissed.

**B.  Retaliation**

Plaintiff claims that defendants Huff, Lane and Korte removed him from his job in Metal Fabrication in retaliation for plaintiff having filed grievances against them. Defendants contend that there is no genuine issue that they took no adverse employment action against him after plaintiff filed a grievance. "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005) (citations omitted). To survive summary judgment, plaintiff must present evidence showing prison officials took some action against him "for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam). Plaintiff has the burden of establishing a causal connection between the exercise of constitutional rights and the allegedly retaliatory action. *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir.1995). "A chilling effect on a prisoner's First Amendment right to file prison grievances is sufficient to raise a retaliation claim." *Bruce v. Ylst*, 351 F.3d 1283 (9th Cir. 2003); *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997). Causation may be shown by evidence sufficient for a jury to infer that the defendant's conduct was motivated by the plaintiff's exercise of a protected right. *Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 751-52 (9th Cir. 2001). Such evidence includes the temporal proximity between the plaintiff's exercise of his right and the allegedly retaliatory conduct, or that defendant knew of the speech and expressed opposition thereto. *Pratt*, 65 F.3d at 808; *see also Keyser,* 265 F.3d at 751-52. It is worth repeating that plaintiff has the burden of proof at trial. Thus, on summary judgment the court must reject plaintiff's conclusory assertions and "satisfy itself that there is sufficient 'direct or circumstantial evidence' [to establish the material fact in question] to create a genuine issue of fact for the jury, before it can deny summary judgment . . . ." *Lindsey v. Shalmy*, 29 F.3d 1382, 1385 (9th Cir. 1994).

It is undisputed that on January 27, 2004, Lane warned plaintiff that his job performance must improve in order to avoid a reduction in skill rating. On February 24, 2004, plaintiff filed his first grievance. Two days later, on February 26, 2004, defendant Korte noted that when plaintiff returned to Saws and Shears from the Paint department, his skills had deteriorated. On March 24, 2004, one month later, Lane decided to reduce plaintiff's pay. There is no evidence that any defendant made any statements or notations suggesting that they resented or were

11

1  hostile to plaintiff's filing any grievance, much less the one filed February 24, 2004.
2  Defendants' reason for their actions, i.e., plaintiff's declining job performance, is wholly
3  unrelated to plaintiff's right to file grievances. On the other hand, the motivations for
4  defendants' actions are related to prison safety. Plaintiff was operating dangerous machinery.
5  Plaintiff has submitted no direct evidence that the decision to reduce his pay and remove him
6  from his PIA job was motivated by his filing a grievance. Neither has he submitted
7  circumstantial evidence sufficient to survive summary judgment.
8  　　　　The same analysis applies to plaintiff's December 7, 2004, removal from the PIA.
9  Plaintiff's July 7, 2004, grievance was filed five months before his termination, a time too
10 remote under the circumstances presented here to suggest retaliation. That plaintiff filed a
11 grievance on December 1, 2004, six days before he lost his PIA position is insufficient to create
12 a genuine issue for trial. To the contrary, plaintiff declining performance had been a growing
13 concern long before either grievance. For nearly a year, plaintiff's supervisors had been
14 discussing their concern about his poor job performance with plaintiff and advising him that he
15 must improve in order to retain his PIA position. There is no evidence that defendants in any
16 way indicated that they opposed plaintiff's use of the grievance system around the time of his
17 termination. Thus, no reasonable jury could find that the decision to decrease plaintiff's pay or
18 to remove him from his job was motivated by plaintiff's having filed grievances. Defendants are
19 entitled to judgment as a matter of law on this claim.
20 　　　**C.  Equal Protection**
21 　　　Plaintiff claims that defendants Korte, Huff and Lane violated his right to equal
22 protection of the law by removing plaintiff from his prison job and giving him a lower paying
23 job because he receives mental health services. Defendants contend that there is no genuine
24 issue about whether plaintiff's demotion and termination were rationally related to a legitimate
25 state interest. The Fourteenth Amendment's guarantee of equal protection is a command that
26 states treat similarly situated persons alike. *City of Cleburne, Tex. v. Cleburne Living Center*,

12

473 U.S. 432, 439 (1985) (per curiam).  This guarantee applies inside prison walls.  *Lee v. Washington*, 390 U.S. 333, 333 (1968).  However, neither prisoners nor persons with mental handicaps are a suspect class entitled to heightened scrutiny  *See Mayner v. Callahan*, 873 F.2d 1300, 1302 (9th Cir. 1989); *City of Cleburne*, 473 U.S. at 440.  Therefore, the question is whether the classification is "rationally related to a legitimate government interest." *City of Cleburne*, 473 U.S. at 440.  Plaintiff has the burden of proving that there is no such relationship.  *Mathews v. Diaz*, 426 U.S. 67, 82 (1976).   There is no question that a safe work environment in prison is a legitimate government interest.  *See Johnson v. California*, 543 U.S. 499, 512  (2005) (safety and security in prison is a compelling government interest); *see also*, *Pell v. Procunier*, 417 U.S. 817, 823 (1974);  *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997).

It is undisputed that plaintiff never caused an accident, but other prisoners who were involved in accidents were not discharged.  But there is no evidence that these workers were unable or unwilling to correct the factors that caused their errors.  Nor is there any evidence that these prisoners were the sole cause of the injuries.  For example, one prisoner who was operating a forklift drove into another prisoner.  It is possible that the injured prisoner, and not the operator, was careless.  There is no evidence on this question and it is plaintiff's burden to prove his claim.  Without any evidence about the particular circumstances surrounding the incidents involving other prisoners, no jury could perform any sort of meaningful comparison to plaintiff's circumstances.  Furthermore, defendants have submitted evidence that in September 2004, Huff found that plaintiff's job performance was not satisfactory and that his work ethic had deteriorated.  On January 27, 2004, defendant Lane warned plaintiff that if he did not improve, his skill rating might be reduced.  In February 2004, Huff again found that plaintiff's job performance was below average, and recommended the pay decrease.  On March 24, 2004, Lane decided to decrease plaintiff's pay, effective May 1, 2004.  Again, plaintiff was warned of this eventuality.  Not until April 29, 2004, did Lane learn that plaintiff was taking medication that might affect his job performance.  Furthermore, when Lane spoke to medical staff, he merely

13

requested that plaintiff's medication be evaluated and stated that he did not want any specific information about plaintiff. Thus, plaintiff has not submitted any evidence that defendants intentionally treated him differently from similarly situated prisoners.

Furthermore, the evidence currently before the court shows that defendants were concerned about plaintiff's ability to safely perform his job and that Lane did not know plaintiff was receiving mental health services until after deciding to decrease his pay. There is no evidence that the other defendants knew plaintiff was receiving mental health services. For like reason, plaintiff's challenge to his December 7, 2004, removal from the PIA must fail. The quarterly evaluations after his pay was decreased show that plaintiff did not improve his job performance. Nearly a year had passed since Lane had warned plaintiff that his skill rating, i.e., the kinds of jobs available to plaintiff, would be decreased if he did not demonstrate he satisfactorily could perform his job. On this evidence, no reasonable jury could find that defendants intentionally discriminated against him because he received mental health services. Accordingly, defendants are entitled to judgment as a matter of law on this claim.

**D. Supervisor's Liability**

Plaintiff asserts that Carey is subject to liability on each claim because plaintiff notified him of defendants' actions, but he failed to intervene on plaintiff's behalf. Defendant Carey contends that plaintiff cannot show that he was involved with the actions of the other defendants. To prevail on an action brought under 42 U.S.C. § 1983, plaintiff must show that an identified defendant deprived plaintiff of a right secured to him by the Constitution or laws of the United States while acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48-49 (1988). A supervisor is liable for constitutional violations of his subordinates if he participated in or directed the violations, or knew of the violations and failed to act to prevent them, *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989), or if he implemented a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989).

It is undisputed that defendant Carey was the warden at CSP-Solano at the time of the events giving rise to this action. It also is undisputed that plaintiff wrote to Carey on May 4, 2007, complaining that Lane had contacted the medical department about plaintiff's medications. Carey informed plaintiff of how his alleged difficulties with Lane must be raised within the prison. There is no evidence that Carey knew Lane would contact the medical department for any purpose, much less an improper purpose, yet failed to intervene. Thus, Carey could not have prevented it. Neither is there any evidence that Carey implemented an unconstitutional policy that caused a violation of plaintiff's rights. Thus, nothing in the record suggests that anything he did caused such a violation. Without any evidence of Carey's involvement in the alleged violations, no reasonable jury could find in plaintiff's favor on either his retaliation or his Equal Protection claim. Accordingly, defendant Carey is entitled to judgment as a matter of law.

Accordingly, it is hereby RECOMMENDED that:

1. Defendants' September 28, 2006, motion for summary judgment be granted;

2. That judgment be entered in their favor; and

3. The Clerk be directed to close the case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 31, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE